# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0531V

|  |  |
|---|---|
| BONNIE MILLER,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: July 8, 2024 |

*Edward M. Kraus, Kraus Law Group, LLC,* Chicago, IL, for Petitioner.

*Lauren Kells, U.S. Department of Justice,* Washington, DC, for Respondent.

## FINDINGS OF FACT AND DISMISSAL OF TABLE CLAIM[1]

  On April 29, 2020, Bonnie Miller filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA"), a defined Table injury, after receiving the influenza ("flu") vaccine on November 2, 2017. Petition at 1, ¶¶ 3, 30. She further alleges that she "felt pain in her upper right arm immediately after receiving the shot." *Id.* at ¶ 4; *accord. Id.* at ¶ 29.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, a preponderance of the evidence supports the conclusion that the onset of Petitioner's right shoulder pain occurred *later* than 48 hours post-vaccination, and that there is a viable alternative explanation for her symptoms – meaning Petitioner cannot establish a Table SIRVA.[3] Any causation-in-fact version of the claim will only succeed if Petitioner can provide preponderant evidence of a vaccine-caused injury consistent with the pain onset determined in this Ruling.

### I.     Relevant Procedural History

Approximately two weeks after the case's initiation, Ms. Miller filed her affidavit and the medical records required under the Vaccine Act. Exhibits 1-10, ECF Nos. 6, 8; *see* Section 11(c). On June 29, 2020, the case was activated and assigned to the "Special Processing Unit" (the "SPU" - OSM's adjudicatory system for resolution of cases deemed likely to settle). ECF No. 9.

At the initial status conference, held on July 23, 2020, Respondent requested that Petitioner confirm whether she had attended physical therapy ("PT") prior to December 15, 2017 – as the call she placed to her primary care provider ("PCP") on that date suggests. *See* Order, issued July 24, 2020, at 1, ECF No. 15 (citing Exhibit 9 at 9 – entry related to this call). In response, Petitioner filed a status report on August 24, 2020, representing that she never attended PT prior to December 2017. ECF No. 16.

Over the subsequent year, Petitioner provided updated medical records and information related to her treatment and condition. Exhibits 11, ECF No. 24; Status Reports, ECF Nos. 19-20, 22-23, 25-26. Due to her ongoing treatment, she had not yet forwarded a demand and supporting documentation to Respondent. *See,* e.g., Status Report, filed June 1, 2021, ECF No. 25.

On August 31, 2021, Respondent stated that he was willing to engage in settlement discussions. ECF No. 27.  During the subsequent six-month period, the parties exchanged several offers and counteroffers, and Petitioner filed additional updated medical records. Exhibits 12-14, filed Jan. 27, 2022, ECF No 31; Status Reports, filed Nov. 1, 2021 and Feb. 7, 2022, ECF Nos. 29, 32. On March 1, 2022, Respondent informed me they had reached an impasse. ECF No. 33.

On May 2, 2022, Respondent filed his Rule 4(c) Report opposing compensation. ECF No. 34. Emphasizing the almost six-week delay before Petitioner sought treatment,

---

[3] *See* 42 C.F.R. § 100.3(c)(10)(ii) & (iv) (2017) (the second and fourth Qualifications and Aids to Interpretation ("QAI") criteria for a Table SIRVA - related to pain onset and an alternative cause).

her inconsistent and unreliable recollections of pain onset, and her own reports of an alternative cause for her shoulder pain, Respondent maintained that Petitioner was unable to satisfy the second and fourth QAI criteria. *Id.* at 14-17; *see* 42 C.F.R. § 100.3(c)(10)(ii) & (iv) (2017).

I subsequently ordered the parties to brief the two issues raised by Respondent, and they did so. Petitioner's Brief Regarding Onset ("Brief"),[4] filed Sept. 12, 2022, ECF No. 37; Respondent's Response to Brief, ECF No. 38; Petitioner's Reply Brief Regarding Onset ("Reply"), Nov. 14, 2022, ECF No. 40. She also filed a declaration[5] supplementing her earlier affidavit. Exhibit 15, ECF No. 39.

The matter is now ripe for adjudication.

## II. Table SIRVA Claim

### A. Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25,

---

[4] Although Petitioner included only onset in the title, she also addressed the question of a viable alternative cause in the briefing. Brief at 10-12.

[5] Although not notarized, the declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibit 15.

1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### B.  Findings of Fact

I make these findings, related to onset and a viable alternative cause, after a complete review of the record to include all medical records, statements, declarations, briefing, and additional evidence filed. Specifically, I base the findings on the following evidence:

- Prior to receiving the flu vaccine on November 2, 2017, Ms. Miller (then 66 years old) suffered from asthma triggered by dust, allergies to opioids and sulfa drugs, hemorrhoids and colon polyps, vitamin D deficiency, hypertension, and hypercholesterolemia. Exhibit 5 at 69, 79, 83.

- At the visit when she received flu vaccine in question, Petitioner also reported insomnia and intermittent left knee for months. Exhibit 5 at 39. Noted to be taking Tramadol (*id.* at 40), Petitioner "[s]tate[d] she had a workup at IBJ (notes not available) [and] . . . Physical Therapy at Athletico"[6] (Exhibit 5 at 39).

- Petitioner received the flu vaccine intramuscularly in her right deltoid at the November 2, 2017 visit to her PCP. Exhibit 5 at 57.

- Approximately six weeks later, on December 15, 2017, Petitioner called her PCP for test results (which were normal) and to request a PT referral for that same day. Exhibit 9 at 9. This medical record entry stated Petitioner was "demanding [a] referral to physical therapy TODAY because she has had arm pain since her flu shot last month and met with a physical therapist who told her she had bursitis from her injection." *Id.* (capitalized letters in the original). It was noted that Petitioner did not want an evaluation, only the PT referral. *Id.* There is no entry of an earlier call or calls regarding right shoulder pain in these records.

- Three days later, on December 18, 2017, Petitioner was able to obtain an appointment with another physician at her PCP's clinic.[7] Exhibit 5 at 29-35. At this visit, she reported right arm pain, but at the injection site only, with

---

[6] Presumedly IBJ stands for Illinois Bone and Joint, where Petitioner received orthopedic treatment after her right shoulder pain, beginning in March 2018. *See* Exhibits 1, 6, 11, 13. Petitioner has filed no records from Athletico PT, and she received treatment for her right shoulder pain at Quality PT. Exhibits 4, 7, 12.

[7] Petitioner has stated that she was forced to see a different provider because her usual PCP was still unavailable. Brief at 2. And the medical records show that she was usually seen by a different provider. *Compare* Exhibit 5 at 32 (listing provider seen on December 18th *with id.* at 36-94 (showing usual PCP).

5

an onset after the flu shot six weeks ago. *Id.* at 30. Expressing concern that Petitioner might be experiencing a hematoma, the physician diagnosed Petitioner with a "[r]esolving location reaction to injection site" and prescribed prednisone. *Id.* at 32. He added that he would refer Petitioner to an orthopedist if her condition had not improved. *Id.*

- X-rays taken that same day, on December 18, 2017, revealed demineralization, mild to moderate degenerative changes of the acromioclavicular ("AC") joint, and AC joint arthritis. Exhibit 9 at 5.

- The next day, Petitioner attended an initial evaluation for PT, reporting "a history of *gradually increasing* RT shoulder pain that began around few weeks [ago] and was *associated with a strain while exercising*." Exhibit 4 at 19 (emphasis added). Identifying her chief concern as "a constant, moderate ached in the lateral aspect of her shoulder," Petitioner stated that her symptoms were aggravated by reaching up and sleeping on her shoulder, prevented her from returning to athletic activities, and was alleviated by rest. *Id.* She described physical activity that included cycling three times a week and light weightlifting. *Id.*

- Over the subsequent three-month period, Petitioner exhibited steady improvement while attending a total of nine PT sessions - including an increased ability to sleep and to reach overhead and behind her back. Exhibit 3 at 5, 8, 10, 12, 22, 24, 27. By her ninth PT session on March 13, 2018, Petitioner reported pain severity from one to two out of ten, exhibited only slight weakness and limitations in ROM, and was assessed as 80 percent improved. *Id.* at 27.

- On March 30, 2018, Petitioner visited an orthopedist at Illinois Bone and Joint ("IBJ"), complaining of right shoulder pain, "starting since January after getting a flu shot." Exhibit 1 at 21. "She state[d] that it initially started at [the] site of the injection and is now within the shoulder." *Id.* Describing the pain as sharp, throbbing, and aching, Petitioner reported difficulty sleeping and performing "overhead activities, throwing, or lifting." *Id.* She added that she "does work out at a gym." *Id.* This information matches what Petitioner wrote on her intake form, along with "Shoulder Pain after Flu Shot (3 months)" on the line designated for the reason for the visit. *Id.* at 25. After observing no redness or swelling, nearly full ROM, and some discomfort with forward flexion and abduction, the orthopedist diagnosed Petitioner with "[r]ight shoulder impingement and subacromial bursitis." (*id.* at 21) and administered a steroid injection (*id.* at 22).

- Petitioner began a second round of PT at the same clinic (Quality PT) on May 15, 2018, reporting pain levels that ranged from three to five at best and six to nine at worst. Exhibit 3 at 119. Upon examination, the therapist noted Petitioner's examination "identified shoulder mobility deficits associated with cervicalgia." *Id.* at 120.

- When Petitioner returned to the orthopedist on May 25, 2016, she reported "overall she is doing much better," but "still ha[d] some incremental pain in her right shoulder and neck region." Exhibit 1 at 20 Upon examination, she exhibited full ROM without significant pain, "mild discomfort with impingement signs, . . . [and] mild paraspinal muscle tenderness of her right cervical spine." *Id.* Recommending that Petitioner continue PT, the orthopedist opined that any vaccine reaction was not clear, "but presumedly there [wa]s some inflammatory response that she got that may have aggravated her bursitis." *Id.*

- At her sixth PT session and re-evaluation on July 23, 2018, Petitioner reported 60 percent improvement, adding that she "was doing well until last week [when her] shoulder started to hurt again." Exhibit 3 at 108. Noting that her pain level was currently five, Petitioner stated that her pain was usually one to two at rest and three to five at its worst. *Id.* The therapist recommended Petitioner reduce her PT to once a week. *Id.* at 109.

- At an orthopedic visit the next day, Petitioner recounted significant relief from the steroid injection she received on March 30, 2018, but a recurrence of her symptoms. Exhibit 1 at 19. Reporting that she was going on vacation and "[wa]s about to start PT again, Petitioner asked about another steroid injection. *Id.* After administering the injection, the orthopedist provided Petitioner with a prescription for additional PT, talked to her about ice and rest, and stated that she should return in four to six weeks when he would consider further imaging if her symptoms continued. *Id.*

- At her first PT session following her vacation on August 7, 2018, Petitioner stated that she was "in pain, I was on vacation and did some lifting." Exhibit 3 at 103. She rated her current pain as six out of ten. *Id.*

- By her next PT session on August 10, 2018, Petitioner stated that her "shoulder still hurts, [but she was] a little bit better than last time." Exhibit 3 at 101. At this visit, she rated her pain level as five out of ten. *Id.*

7

- Petitioner continued to show slight improvements during four more PT sessions in August. Exhibit 3 at 93-100. At her PT session on August 17, 2018, Petitioner's condition was attributed to chronic tendinitis. *Id.* at 97.

- When Petitioner returned to the orthopedist on August 30, 2018, she reported persistent pain that "ha[d] not gotten better with physical therapy or the [steroid[ injection." Exhibit 1 at 16. Assessing Petitioner as having a rotator cuff injury, he ordered an MRI. *Id.*

- Performed the next day, the MRI revealed a "[h]igh-grade partial-thickness slit-like interstitial tear of the posterior supraspinatus/anterior infraspinatus tendon at the footprint, with possible bursal surface violation, [b]ackground of mild tendinosis," "[m]oderate acromioclavicular joint degenerative changes," and "[t]race subacromial subdeltoid bursal fluid." Exhibit 1 at 14.

- On September 18, 2018, Petitioner saw a different orthopedist at the same clinic to discuss treatment options. Exhibit 1 at 13. Although he recommended surgical repair of the rotator cuff tear visible on the MRI, Petitioner opted to try one more round of PT. *Id.*

- At her PT evaluation on September 25, 2018, Petitioner was described as having "a history of gradually increasing RT shoulder pain, that began around several month[s] and was not associated with a specific mechanism of injury." Exhibit 3 at 87. Under treating diagnoses, "[p]ain in right shoulder" and "[i]ncomplete rotator cuff tear or rupture of right shoulder, not specified as traumatic" were listed. *Id.*

- After obtaining no improvement, Petitioner returned to the orthopedist to discuss surgery. Exhibit 1 at 9. At this visit, she also complained of left wrist pain from a recent fall. *Id.*

- Petitioner attended post-surgical appointments on December 11 and 18, 2018. Exhibit 1 at 2, 5-6; Exhibit 6 at 7, 12. Her sutures were removed on December 18th. *Id.* at 2.

- During arthroscopic surgery, performed on December 7, 2018, the surgeon observed a "complete tear through the supraspinatus all the way down to the footprint" and a "significant amount of bursal inflammation." Exhibit 1 at 3. Under the reasons for the procedure, Petitioner was described as a 66-year-old woman who has been having pain in the right shoulder over the past many months, [which] seemed to be triggered by a flu vaccination." *Id.*

8

- From December 2018 through March 2019, Petitioner attended 27 post-surgical PT sessions. Exhibit 3 at 10-69; Exhibit 7. At her last session on March 21, 2019, she reported 70 percent improvement and a pain level of three out of ten. Exhibit 7 at 13.

- Petitioner also visited the orthopedist in January, March, and May 2019. Exhibit 6 at 8-11. On May 17, 2019, Petitioner was described as making an "[e]xcellent recovery following arthroscopic rotator cuff repair" with her main remaining issue being "restricted internal rotation." *Id.* at 8.

- At an appointment with her PCP on November 21, 2019, Petitioner reported good ROM but "persistent mild intermittent achey [sic] pains at [the] right shoulder . . . present with some movements such as reaching behind [her] back but not typically present at rest." Exhibit 8 at 34.

- Petitioner did not seek treatment again until almost fourteen months later, and almost nine months after filing her petition. Exhibit 11 at 1.

- In her later filings (the affidavit, initial brief, reply brief, and supplemental declaration), Petitioner addressed her first report of right shoulder pain reflected in a December 15, 2017 medical record - approximately six weeks post-vaccination. In her affidavit, executed on May 4, 2022, Petitioner insisted that she was seen in person that day by her PCP, who informed her she "was experiencing an injection site reaction and referred [her] to physical therapy." Exhibit 10 at ¶ 6. In briefing and the supplemental declaration, provided several months later in the fall of 2022, Petitioner acknowledged this communication was by telephone. Brief at 2; Reply at 1; Exhibit 15 at ¶ 6.

- In her initial brief and supplemental declaration (signed under penalty of perjury on September 8, 2022, but filed along with the reply brief in November 2022), Petitioner maintained that she called her PCP prior to December 15, 2017, unsuccessfully seeking an appointment. Brief at 1 (describing one call); Exhibit 15 at ¶ 5 (declaration reporting several calls during the weeks following vaccination). However, in her reply brief, provided in November 2022, Petitioner stated that the December 15, 2017 call was the first report of her injury. Reply at 1.

- In her reply brief, Petitioner also explained that she did not attend PT prior to December 2017, as the entry related to the December 15th call seems to

9

      indicate. Reply at 2. Rather, she had spoken to a physical therapist who "was an acquaintance with whom she had discussed her injury, not a provider." *Id.*

- In these later filings, Petitioner also addressed the history contained in the record from her initial PT evaluation on December 19, 2017, linking her right shoulder pain to a strain suffering while exercising. She recalled telling the therapist that her symptoms began immediately after vaccination, were caused by the flu vaccine she received, and prevented her from performing her exercise routine as it aggravated her symptoms. Brief at 2; Exhibit 15 at ¶ 8. She theorized that, based on that description, the therapist then reported an incorrect history in the report from her initial PT evaluation which was repeated in subsequent records. *Id.*

      The record as it now stands reveals histories in the contemporaneously-created medical records that vary greatly. Petitioner argues that these differences are due entirely to errors on the part of those individuals creating the records, and I agree that medical records can contain similar mistakes. However, the sheer volume of these differences overwhelms such explanations, which reveal Petitioner's consistent failure to recall the timeline of events she now contends she experienced.

      Furthermore, later filings support the proposition that Petitioner is not an accurate historian. Even in these filings, created solely by Petitioner and her counsel from May to November 2022 (a period of slightly more than six months), she makes assertions based upon divergent recollections.

      The preponderant evidence in this case supports a finding that Petitioner did not likely experience the immediate pain onset that she claims, but rather more gradual, later shoulder joint symptoms that could have been caused by strenuous exercise. Although there is some evidence that Petitioner may have suffered a more immediate reaction at the site of administration, there is substantial evidence showing the symptoms related to her shoulder joint – the kind of symptoms indicative of a SIRVA - started much later. And there is insufficient evidence connecting these two sets of distinct symptoms.

      The most compelling evidence supporting a more gradually-occurring right shoulder pain onset (rather than one that happened within 48 hours) is provided by the undisputed details related to Petitioner's December 15th call to her PCP. By her own admission, Petitioner attributed her symptoms to the flu vaccine she received only after an acquaintance who was a physical therapist *suggested* this causal link. If Petitioner's pain occurred immediately upon vaccination as she later claimed, she would not have needed such prompting to reach this conclusion.

Furthermore, the medical records in this case are replete with descriptions of a gradual pain onset, and symptoms which improved, then worsened, and that were often linked to Petitioner's exercise regimen. When first seen seeking treatment at her PCP clinic on December 18, 2017, Petitioner reported right arm pain, at the injection site only. Exhibit 5 at 30. At her orthopedic appointment on March 30, 2018, Petitioner described pain that initially started at the site of the injection and was now within her shoulder. Exhibit 1 at 21. On several occasions, Petitioner's condition was clearly aggravated by such activities such as weightlifting. Exhibit 1 at 21 (stating she was working out); Exhibit 3 at 108, 103 (reporting increased symptoms in her shoulder and neck). Such a gradual onset and fluctuating symptoms are more consistent with an exercise-related, rather than vaccine-caused, injury.

It is important to note that a petitioner will fail to satisfy the fourth QAI criteria if there is preponderant evidence of a condition that *would* explain the petitioner's current symptoms. *See* 42 C.F.R. § 100.3(c)(10)(iv). The condition or abnormality must qualify as an explanation for the symptoms a petitioner is experiencing, but need not be a better or more likely explanation. *Durham v. Sec'y of Health & Hum Servs.,* No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. Apr. 7, 2023). In effect, and although the same preponderant evidentiary burden applies to this QAI as with all others, this Table element does not impose on Respondent the obligation to prove an "alternative cause" for the injury, but instead merely that the record contains sufficient evidence of a competing explanation to "muddy" a finding that vaccine administration was the cause.[8] To satisfy this last QAI criterion, Petitioner would have to establish at least some left shoulder symptoms which would not be explained by exercise.

Accordingly, I find the preponderant evidence supports a finding that Petitioner's right shoulder pain began *later* than 48 hours post-vaccination and there exists another condition that would explain her symptoms. Thus, Petitioner's Table claim is DISMISSED.

### III.    Potential for Off-Table Claim

The failure to establish a Table injury does not necessarily constitute the end of a case under all circumstances, because a claimant might well be able to establish a non-Table claim for either causation-in-fact or significant aggravation. *See Althen v. Sec'y of*

---

[8] Of course, claims that are styled as a SIRVA Table claim but which "fall out" may still remain viable as a causation claim – and in such circumstances the usual considerations applicable to "factor unrelated" alternative causes, and the shifted burden considerations, will come into play. For present purposes, what matters is that this Table element expressly requires the *petitioner* to show no other "condition or abnormality."

*Health & Hum. Servs.*, 418 F.3d 1274 (Fed. Cir. 2005); *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (citing *Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009)).

Despite my factual findings related to the Table criteria, it is still possible that Petitioner may be able to prove that the flu vaccine caused her right shoulder injury. However, she will need to provide additional evidence of a causal link and appropriate time frame between the flu vaccine she received and her right shoulder pain. Formal resolution of this issue will likely require further review and most likely the retention of experts, which I am not inclined to authorize in the SPU. However, I will first allow the parties an additional 30 days to determine if an informal resolution can be reached. Thereafter, I will transfer the case out of SPU.

## Conclusion

Petitioner has not established the onset of her right shoulder pain occurred within 48 hours of her receipt of the flu vaccine on November 2, 2017. Additionally, there is evidence of a condition or abnormality that would explain Petitioner's symptoms. **Accordingly, her Table SIRVA claim is dismissed.**

Because Petitioner *may* prevail on an off-Table claim, the parties should make one more attempt to reach an informal settlement in this case, before I reassign it out of SPU. **The parties shall file a joint status report indicating whether they believe an informal settlement could be reached in this case and updating me on their current efforts by no later than <u>Friday, August 09, 2024</u>**.

IT IS SO ORDERED.

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master